William A. Aniello (SBN 345080)
23320 Oxnard Street
Woodland Hills, California 91367
Telephone: (917) 757-2244
willaniello@esjlaw.info

Elizabeth Sarah Johannesen (pro hac vice application forthcoming)
JOHANNESEN & UMANA, P.C.
68 Jay Street, Suite 225
Brooklyn, New York 11201
Telephone: (917) 757-2244
elizabethsarahjohannesen@esjlaw.info

Attorneys for Plaintiffs
AMBER GENTILE and FASHIONLUXDESIGNER LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| AMBER GENTILE, an individual; and FASHIONLUXDESIGNER LLC, an Illinois limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>LENA MANSOR, also known as LENA MANSOUR and LENA JEBO, an individual,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br>(1) Defamation (Libel Per Se);<br>(2) Trade Libel;<br>(3) Intentional Interference with Contractual Relations;<br>(4) Intentional Interference with Prospective Economic Advantage;<br>(5) Intentional Infliction of Emotional Distress;<br>(6) Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.; and<br>(7) False Advertising, Lanham Act, 15 U.S.C. § 1125(a)(1)(B)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Amber Gentile ("Gentile") and FashionLuxDesigner LLC ("FashionLux," and together with Gentile, "Plaintiffs") allege as follows against Defendant Lena Mansor ("Mansor"):

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because the Seventh Cause of Action arises under the Lanham Act, 15 U.S.C. § 1125(a), and under 28 U.S.C. § 1338(b) because Plaintiffs' claim for unfair competition is joined with a substantial and related claim under the Lanham Act.

2. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). Gentile is a citizen of Illinois. FashionLux is a citizen of Illinois because its sole member, Gentile, is a citizen of Illinois. Mansor is a citizen of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

3. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the Lanham Act claim.

4. This Court has personal jurisdiction over Mansor, who is domiciled in California and committed the acts alleged in this Complaint from California.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Mansor resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred here. This action is properly assigned to the Eastern Division because Mansor resides in Riverside County.

**PRELIMINARY STATEMENT**

6. Since August 27, 2026, Mansor, a competing reseller of luxury goods, has told the buyers and sellers with whom FashionLux does business that Gentile knowingly sells counterfeit jewelry and that the FBI is investigating her. Neither is true. Mansor says it to take FashionLux's customers for herself.

7. Mansor's statements have reached a wide audience in the online communities in which FashionLux does business, including FashionLux customers such

as Dr. Shahrzad Borhan-Manesh ("Borhan-Manesh") and other members of those communities such as Tami Griggs Vanlerberg ("Vanlerberg"). Mansor has encouraged them to turn on Gentile, and, as alleged in further detail below, they have done so.

8. Mansor's campaign has also drawn in Steven C. Vondran ("Vondran"), an attorney who solicits, in Facebook groups, buyers who believe they have purchased counterfeit Van Cleef & Arpels jewelry and encourages them to have their pieces examined and to come forward with claims.[1] Vondran's role is alleged in further detail below.

## THE PARTIES

9. Plaintiff Amber Gentile is an individual who resides in Elgin, Kane County, Illinois. Gentile is a citizen of Illinois.

10. Gentile is the founder and sole member of FashionLux. She conducts FashionLux's business through the Instagram account @fashion_lux_finds_2, on which she is identified by name.

11. Plaintiff FashionLuxDesigner LLC is a limited liability company organized under the laws of Illinois, with its principal place of business in Elgin, Illinois. Its sole member is Gentile. FashionLux is therefore a citizen of Illinois.

12. FashionLux sells pre-owned luxury handbags, jewelry, and accessories on consignment, principally through @fashion_lux_finds_2.

13. Defendant Lena Mansor, also known as Lena Mansour and Lena Jebo, is an individual who resides at 16407 Ridge Field Drive, Riverside, California 92503. Mansor is a citizen of California.

14. Mansor operates the verified Instagram account @chanelista123_, which has approximately 50,300 followers.

15. Mansor posts in Facebook groups under the name "Lena Jebo," including the private group "Van.Cleef.and.Arpels Buy, Sell, Chat Group" (the "Facebook Group"),

---

[1] See Vondran Legal, Van Cleef & Arpels Counterfeit Jewelry Lawyer, https://www.vondranlegal.com/van-cleef-arpels-counterfeit (last visited Oct. 14, 2026).

which has approximately 23,900 members.

## FACTUAL ALLEGATIONS

### A. Gentile and FashionLux

16. FashionLux is a consignment business. Owners of pre-owned luxury pieces consign them to FashionLux under written consignment agreements. FashionLux markets and sells the pieces and remits the proceeds to the consignor, less its fee.

17. Every piece FashionLux sells is pre-owned. Each comes from another person: a bag, a piece of jewelry, or an accessory that its owner has used, worn, or no longer wants.

18. FashionLux does not buy its inventory from the luxury houses or their boutiques. Its pieces come to it from their owners, not directly from the store.

19. Because its pieces do not come directly from the store, each must be authenticated before it is resold. The same is true for every reseller of pre-owned luxury goods, including Mansor.

20. FashionLux accepts on consignment and sells pre-owned pieces from Chanel, Gucci, Louis Vuitton, Hermès, Rolex, Prada, Tiffany & Co., and Van Cleef & Arpels, among other houses. Most of its business is handbags.

21. FashionLux's fee generally ranges from ten to twenty percent of the sale price. Its fee on jewelry is at the lower end of that range, and sometimes below it. Its fee on handbags is at the higher end. The rest goes to the consignor.

22. Gentile is a hardworking businesswoman. She built FashionLux on social media, and she built it by being herself. She does not use her accounts to portray a flawless luxury life. She shows her real day: unfiltered, in jeans and a T-shirt, picking her children up from school, singing and dancing with her family. Her customers see what is behind the curtain, and they trust her because of it.

23. Gentile does not live the life her inventory might suggest. She keeps few luxury pieces for herself, and she is more often found in a T-shirt and a hat than carrying a Birkin.

24. FashionLux screens the pieces submitted to it for consignment and rejects those it cannot authenticate.

25. FashionLux pays an independent authentication service to examine pieces submitted for consignment. When the service reports a piece counterfeit, FashionLux rejects it and does not offer it for sale. FashionLux rejected a Hermès Evelyne bag in October 2025, a large Chanel Coco Handle bag in July 2026, and a Louis Vuitton fan bag in August 2026, each after the service reported it counterfeit.

26. On a recent occasion, FashionLux's screening identified a Louis Vuitton bag submitted for consignment as inauthentic. Gentile rejected the bag, returned it, and told the consignor it was not authentic. The consignor, embarrassed, explained that the bag had been a gift.

27. Nothing has ever been proven to show that FashionLux knowingly sold any item that was not authentic.

28. FashionLux's customers and consignors are concentrated in small online communities of buyers and sellers of luxury goods that transact in private Facebook groups and on Instagram, including the community of buyers and sellers of Van Cleef & Arpels jewelry.

29. FashionLux competes for those customers and consignors with other resellers of pre-owned luxury goods, including Fashionphile and Madison Avenue Couture.

30. In those communities, a seller's reputation for authenticity is its business. An accusation that a seller deals in counterfeit goods ends its ability to attract customers and consignors.

31. Plaintiffs have never knowingly sold a counterfeit item.

**B. Mansor Is a Competing Reseller**

32. Mansor sells luxury goods, including Van Cleef & Arpels jewelry, to the same community and through the same channels as FashionLux.

33. @chanelista123_ is categorized on Instagram as "Shopping & retail" and

advertises that "All items are 100% Authentic." Mansor uses the account to post items marked "SOLD!" that bear a handwritten seller tag reading "Lena Jebo chanelista123_," and to list pieces on behalf of clients.

34. Mansor has advertised and sold Van Cleef & Arpels jewelry on @chanelista123_ since at least October 2021. Her posts include:

(a) October 20, 2021: a Van Cleef & Arpels five-motif malachite bracelet, captioned "5 motif MalachiteSOLD";

(b) March 19, 2022: "VCA bracelet New full set";

(c) April 6, 2022: "Client is selling like new worn 1-2 times full set malachite 5 motif";

(d) April 6, 2022: "Excellent condition, full set, from client! Mother of Pearl VCA earrings $10999";

(e) July 15, 2022: a Van Cleef & Arpels Perlée bracelet, captioned "Brand new VCA Arpels Diamonds full set";

(f) September 13, 2022: "Diamond VCA new full set $12000 hard to get and below retail"; and

(g) September 14, 2022: "Gorgeous Malachite VCA $9400 excellent condition."

35. Mansor's resale business works the same way as FashionLux's. She sells pre-owned pieces that come from other people, including pieces she advertises as "from client!"

36. Mansor understands what reputation is worth in that market. In October 2024, she wrote to Gentile: "I have a good reputation in the groups so I'm super trusted there."

37. Mansor has publicly acknowledged that she is a reseller. On October 13, 2026, she wrote on @chanelista123_: "I know this will put a bad look on resellers and I'm sorry . . . . I am not worried one bit about myself."

**C. Facebook Groups as an Open, Unregulated Forum to Spread False Claims**

38. FashionLux and Mansor sell to the same buyers in the same online forums: private Facebook groups for buyers and sellers of luxury goods, and Instagram.

39. Facebook and Instagram are owned and operated by Meta Platforms, Inc. ("Meta"). The Facebook groups in which Mansor posts are hosted by Meta on Facebook.

40. The Facebook Group is one of those forums. It is a private group of approximately 23,900 members who, as its name states, buy, sell, and discuss Van Cleef & Arpels jewelry. The group is visible to anyone on Facebook, and anyone may ask to join it. Only members may see what is posted in it, and everything posted in it is visible to every member.

41. Members post under their own names or, through the group's anonymous posting feature, under a generated handle such as "ThrillingGoose5058" or "VCAChic." They respond to one another in comment threads that every member can read. Mansor posts in the Facebook Group under her own name, "Lena Jebo," from a verified account.

42. Nothing in these groups requires a member to prove what she publishes. A member may accuse a seller of selling counterfeits, without proof, and the accusation reaches every member at once.

43. Vanlerberg is a member of the Facebook Group. She posts there about Gentile and responds to Mansor's posts, as alleged below.

44. Borhan-Manesh is a physician in Arizona and a FashionLux customer. She posts in these forums and has responded to Mansor's posts, as alleged below.

45. Vondran is an attorney licensed in California and Arizona whose firm solicits buyers of allegedly counterfeit Van Cleef & Arpels jewelry as clients. He solicits them on Facebook, where he and Mansor are Facebook friends and respond to each other's posts.

46. Vanlerberg, Borhan-Manesh, Vondran, and others read Mansor's posts in these forums and respond to her there. Through these forums, Mansor's statements about Plaintiffs reach the buyers and sellers with whom FashionLux does business.

**D. Mansor Bought the Bracelet in 2023 and Wore It for Three Years**

47. On July 28, 2023, Mansor purchased a Van Cleef & Arpels Perlée bracelet bearing serial number JA478282 (the "Bracelet") from FashionLux for $19,200. Before completing the purchase, Mansor asked that the Bracelet's serial number be verified. It was.

48. On delivery, Mansor wrote to Gentile: "Thank you for the safe delivery and great packing!! Can't wait to wear."

49. In 2023, Mansor sent the Bracelet to Van Cleef & Arpels for service. Van Cleef & Arpels accepted the Bracelet, entered its serial number in its system, and registered it to Mansor. Mansor reported to Gentile that it "thankfully looks all well."

50. Mansor wore the Bracelet every day for the next three years. She did not question its authenticity at any time during those three years.

**E. Mansor Demands a Refund and Warns Gentile About Her Reputation**

51. On June 5, 2026, Mansor sent Gentile an Instagram message from @chanelista123_. Mansor wrote that she had paid Fashionphile, another competing reseller, $120 for an online report stating that the Bracelet was "super fake," and demanded "a full refund as soon as possible."

52. Mansor's message concluded:

> "This is very much illegal and can tarnish your reputation very much. Give me my money back and make it easy for the both of us."

53. Mansor's message demanded money and warned that, unless she was paid, Gentile's reputation would suffer.

54. Gentile responded that she stood behind the items she sold and that she would need the Bracelet returned so that she could inspect it.

55. Mansor replied by text message: "No Amber, I am very serious I need my refund done today," and "I will not absolutely accept any other reason to not refund me. Nothing."

56. Gentile replied: "Lena, please do not bully me or threaten me."

57. Mansor returned the Bracelet to Gentile in June 2026.

58. The Bracelet came back with dog hair in it, scratched, and filthy.

59. Gentile inspected the Bracelet herself and found no apparent irregularity. She had found none in 2023, when FashionLux sold the Bracelet to Mansor in good faith on behalf of a consignor.

60. The Bracelet was in such poor condition, however, that Gentile also could not verify that it was the same bracelet FashionLux had sold to Mansor three years earlier.

61. Gentile then submitted the Bracelet to Real Authentication, an independent authentication service. On June 16, 2026, Real Authentication certified the Bracelet as authentic.

62. On June 18, 2026, Plaintiffs, through counsel, sent Mansor a written cease-and-desist letter.

63. With the Bracelet certified as authentic, Plaintiffs declined to pay Mansor's demand.

64. With that, Gentile sent the Bracelet back. It was delivered to Mansor's counsel on September 14, 2026.

65. Mansor's demand for a refund of the $19,200 she paid for the Bracelet is the only dispute between Mansor and Plaintiffs concerning the Bracelet (the "Bracelet Dispute"). It is a private dispute between a buyer and a seller over a single piece of jewelry.

**F. Mansor Goes Public When Plaintiffs Decline to Pay a Claim She Cannot Substantiate**

66. On August 27, 2026, Mansor published a post in the Facebook Group, under the name "Lena Jebo," that identified Gentile by name and accused her of selling Mansor a counterfeit Van Cleef & Arpels bracelet.

67. Gentile is not a member of the Facebook Group. She could not see or

respond to the post, and learned of it from customers.

68. Gentile is a private individual. She has not entered any public controversy about counterfeit jewelry.

69. Mansor's August 27, 2026 post began the campaign against Plaintiffs in the Facebook Group. Whatever controversy now surrounds Plaintiffs there is one Mansor created.

70. From late August through September 2026, Mansor published Instagram stories on @chanelista123_ repeating the accusation and urging her followers to bring claims against Plaintiffs.

71. On September 1, 2026, Plaintiffs, through counsel, requested in writing that Mansor remove her posts and stop posting about Plaintiffs, and advised her that Plaintiffs had preserved her statements and reserved their rights.

72. On September 10, 2026, Mansor published new posts about Plaintiffs. Plaintiffs' counsel objected in writing the same day.

73. On September 13, 2026, Plaintiffs, through counsel, notified Mansor in writing that her publications were false, defamatory, and harassing, and demanded that she stop.

74. Mansor removed nothing.

75. On October 9, 2026, Mansor published a new post on @chanelista123_ and a new post in the Facebook Group.

76. The Instagram post begins, "I have an update for everyone who has been contacting me and following this." It names Gentile and tags @fashion_lux_finds_2. Its caption reads: "If anyone wants to share my experience with Amber Gentile, please do warn others!!"

77. In the Facebook Group post, Mansor published a report from a local jewelry appraiser who has no affiliation with Van Cleef & Arpels, together with a private direct message from Gentile.

78. Mansor's followers reshared the October 9 post in their own Instagram

stories, and Mansor republished those stories on @chanelista123_ to her own followers.

**G. Mansor's False Statements of Fact**

79. In her own posts, comments, and stories, Mansor has made the following statements of fact about Gentile and FashionLux.

80. In her October 9, 2026 Instagram post, Mansor wrote: "Amber even sent 'records' that conflict with the actual transaction and appear to have been made up to shift responsibility to her source."

81. The Facebook Group post alleged in paragraph 77 opens: "***a lot of others have came out!!! Please let me know if you have any fakes!!***"

82. In the comment threads beneath her October 9 posts, Mansor wrote: "I just wish people would come forward if they have been scammed by her! We cannot let people slide like this!"

83. Mansor wrote: "yes I am starting to see the pattern over and over."

84. Beneath her October 9, 2026 Instagram post, in reply to a commenter, Mansor wrote: "yes girl we won't give up! Too many have been affected!"

85. Mansor has repeatedly told her audience that the FBI is involved in her accusations against Gentile, and she has encouraged others to say so.

86. Beneath Mansor's October 9 Instagram post, a commenter wrote that "[r]eaching someone at the FBI is low key impossible and they have no interest in your case if it is a standalone matter." Mansor replied that she had the FBI involved: "yes thank God we have . . . FBI involved."

87. On or about October 13, 2026, Vanlerberg published a post in the Facebook Group that read in full:

> "BEWARE: AMBER GENTILE IS SELLING FAKE VCA JEWELRY! SO MANY PEOPLE ARE COMING FORWARD WITH THEIR FAKE PIECES... FBI IS NOW INVOLVED SO PLEASE GET YOUR ITEMS AUTHENTICATED ASAP!"

88. Within two hours, the post had drawn 41 reactions and 14 comments.

89. A member commented: "Yes @ Lena Jebo that's your case right." Mansor, posting as "Lena Jebo," replied: "yes we are quiet a few girls."

90. By that reply, Mansor told the Facebook Group that the post described her own case against Gentile and that she and several other buyers had claims against Gentile.

91. There is no active FBI investigation into Gentile or FashionLux. Mansor's own statement that she has the FBI involved, alleged in paragraph 86, is false.

92. Mansor's audience repeated it, as she encouraged them to. Beneath Mansor's October 9 Instagram post, a commenter told another reader to "contact the FBI and file C3 Complaint report," adding: "The FBI are waiting for more people to come forward." In the Facebook Group, a member wrote that "[t]here is a reason why there is a lawsuit and FBI involved." There is no lawsuit, and there is no FBI investigation. Plaintiffs plead those comments not as statements by Mansor but to show how her audience understood and repeated what she published.

93. Each of these publications tells Plaintiffs' customers that the FBI is investigating Gentile. None of it is true.

94. On October 13, 2026, Mansor republished her October 9 post in an Instagram story with the caption: "More and more fakes have came out!!!! I will be posting along!!"

95. The same day, Mansor wrote in another story: "if over 10 people have claimed their items are fake, worth over $100,000 then we have a real problem here."

96. The same day, Mansor wrote on @chanelista123_ that Van Cleef & Arpels "polished mine, repaired it and I still paid a fee, thinking that was the only way to authenticate it, however it was my first VCa piece, I had no idea!"

97. In the same series of stories, Mansor wrote of the Bracelet: "even I was Naive to fall for it."

98. The same day, Mansor wrote in another story: "Like I have mentioned

before, I would never bash anyone if I didn't have some hard-core proof!"

99. On October 14, 2026, a FashionLux customer wrote in the Facebook Group that she had purchased several items from Gentile and had "never had an issue," and that she would "genuinely like to see definitive proof from VCA confirming that the item is counterfeit."

100. Mansor replied to her publicly the same day: "I guess you were one of the lucky ones. Do you not realize how many innocent hardworking people, who just realized they purchased fake pieces from her?"

101. In the same reply, Mansor wrote: "There are over 10 women devastated, don't know how to feel they found out their pieces are all fake."

102. In the same reply, Mansor wrote: "Also, I paid almost $20k for a $4k bracelet?" The appraiser's message that Mansor published, as alleged in paragraph 77, states that the Bracelet is worth approximately $4,000 "without the Van Cleef name."

103. In the same reply, Mansor wrote: "Trust me the proof I have on this lady, I would never bash an honest person this way. Unless I have proof."

104. On or about October 14, 2026, beneath another member's post in the Facebook Group about a Van Cleef & Arpels piece she had bought, Mansor wrote, under her own name and from her verified account: "I read on your post, unfortunately VCa worked on my fake bracelet from Amber." In the same thread, Mansor wrote to the member: "Sarah PM me I can do my best to help you."

105. On or about October 16, 2026, in the comment thread beneath her own post in the Facebook Group, Mansor replied to a member who had questioned her campaign: "you actually speak just like Amber, all of a sudden, when people don't agree with you or tell you, your item is fake. It's a witch hunt, everyone is jealous of me, everyone hates me."

106. Mansor's own statements alleged in paragraphs 66, 80 through 105, and 252 through 254 (the "Mansor Statements") state, expressly and by clear implication, that Gentile and FashionLux knowingly sell counterfeit goods, have sold more than $100,000

of them, have defrauded multiple customers in a repeated pattern, deceived Mansor as an inexperienced first-time buyer, fabricated business records to shift blame, agreed to present the Bracelet to Van Cleef & Arpels and failed to appear, and are under investigation by the FBI. By declaring that she holds "hard-core proof," and by telling a customer to "[t]rust me the proof I have on this lady," Mansor represented to her audience that her accusations rest on facts known to her.

107. Each of the Mansor Statements is false. Plaintiffs do not knowingly sell counterfeit goods. They have not defrauded anyone. They did not fabricate any record; the records they provided are FashionLux's genuine records of the transaction. There is no FBI investigation into Plaintiffs. Gentile never agreed to any appointment at Van Cleef & Arpels and so never failed to keep one. Mansor was not an inexperienced first-time buyer, and no one deceived her.

108. The sting of the Mansor Statements is not that a single bracelet is inauthentic. It is that Gentile is a criminal: that she knowingly sells counterfeits, defrauds buyers in a pattern, preys on inexperienced buyers, fabricates records, and is under investigation by the FBI.

**H. Mansor Lies About Her Experience to Make Herself the Victim and the Seller Buyers Should Trust**

109. Mansor's statements that the Bracelet was her "first VCa piece" and that she was "Naive to fall for it," alleged in paragraphs 96 and 97, are lies.

110. The Bracelet was not Mansor's first Van Cleef & Arpels piece. As alleged in paragraph 34, Mansor had been advertising and selling Van Cleef & Arpels jewelry on @chanelista123_, including a Van Cleef & Arpels Perlée bracelet, since at least October 2021, nearly two years before she bought the Bracelet.

111. Mansor was not naive. She was an experienced seller of Van Cleef & Arpels jewelry who marketed pieces as "hard to get and below retail."

112. Mansor lies about her experience to make herself the victim. Her story casts Gentile as a seller who preys on inexperienced buyers, and it casts Mansor as an

innocent whom her audience should rally behind.

113. She tells the story to sell. Her audience is her customer base, and she markets her own Van Cleef & Arpels sales to them through the same campaign.

114. A buyer who believes that story has every reason to stop buying from Gentile, and every reason to trust the seller who told it. Mansor then offers herself as that seller: a reseller whose items are "100% Authentic," as alleged in paragraph 33, selling Van Cleef & Arpels jewelry to the same buyers she warns away from Gentile.

115. The lie gives Mansor a tactical advantage over FashionLux that she could not win by competing on inventory, price, or service. It is an unfair competitive advantage, and she obtains it by deception.

116. Plaintiffs deny that the Bracelet is counterfeit.

117. Mansor's own experience defeats her accusation that Gentile knowingly sold a counterfeit. An experienced seller of Van Cleef & Arpels jewelry, Mansor held the Bracelet, wore it every day for three years, and had it serviced by Van Cleef & Arpels, all without doubting its authenticity.

118. Mansor accuses Gentile of knowing what Mansor, with that experience and three years of daily wear, never detected herself. She tells her audience that Gentile "scammed" her, that Gentile operates in a "pattern," and that the FBI is involved.

119. Vondran, Mansor's Facebook friend, solicits buyers of allegedly counterfeit Van Cleef & Arpels jewelry as clients, as alleged in paragraph 45.

120. On September 30, 2026, Vondran published a public Facebook post telling readers: "If you believe you have purchased fakes, call me."

121. Mansor answered the post. Posting as "Lena Jebo," she commented with three praying-hands emoji. Vondran liked her comment.

122. The same day, Vondran published on his firm's website an article titled "VCA JEWELRY SCAM? BOUGHT FAKE VAN CLEEF & ARPELS JEWELRY? YOU MAY NOT BE ALONE" (the "Vondran Article"), in which he describes himself as "a fake jewelry and counterfeit litigator in California and Arizona."

123. On information and belief, the Vondran Article describes Mansor. It tells readers that "in one case the purchaser returned the item for a refund then received a cease and desist letter from the Seller." Mansor returned the Bracelet to Gentile in June 2026, and Plaintiffs' counsel sent Mansor a cease-and-desist letter later that month, as alleged in paragraphs 57 and 62.

124. The Vondran Article concedes the distinction on which Mansor's accusation fails: "An innocent mistake and a knowing misrepresentation are not the same thing."

125. It acknowledges that online resellers "may be believing they are engaged in honest business."

126. And it disclaims the very accusation Mansor makes:

> "We are not suggesting that every authenticity dispute constitutes fraud, that every seller knowingly sold counterfeit merchandise, or that every authentication disagreement establishes liability. Those questions depend upon evidence."

127. Mansor publishes as established fact what the lawyer soliciting these claims concedes depends upon evidence. She has none.

**I. The FBI Is Not Investigating Plaintiffs**

128. A complaint to the FBI's Internet Crime Complaint Center ("IC3") is an online report that anyone can submit, about anyone, without any proof.

129. On information and belief, members of Mansor's audience were told to file IC3 complaints against Gentile, as alleged in paragraph 92, and at least one of them did so.

130. On information and belief, the FBI does not open an investigation on every IC3 report it receives. An IC3 report is a submission by a member of the public. It is not an investigation, and it is not a finding by anyone that the person reported has done anything wrong. A report that the FBI does not act on, and to which it does not respond,

does not make the FBI "involved" in any matter.

131. On information and belief, the FBI is not investigating any IC3 report concerning Plaintiffs, and there is no FBI investigation into Gentile or FashionLux.

132. On information and belief, the FBI has confirmed that no matter concerning Plaintiffs is pending before it, and that the transaction amounts at issue are far too small for the FBI to pursue.

133. Mansor nonetheless told her audience that the FBI was involved, as alleged in paragraphs 85 through 93. She knew that was not true. The very comment to which she replied told her that the FBI has "no interest" in "a standalone matter," as alleged in paragraph 86.

134. Mansor's statement that the FBI is involved is false. To the extent any member of Mansor's audience filed an IC3 report against Gentile, the statement is also misleading: it presents a report that the FBI has not acted on as a federal investigation of Gentile, and it was made so that Plaintiffs' customers would believe that federal law enforcement had found cause to investigate her.

135. Mansor made those statements to lend her accusations the authority of federal law enforcement and to drive Plaintiffs' customers and consignors away.

**J. Mansor Directs Her Audience Against Plaintiffs to Gain an Advantage as a Competitor**

136. When a member of the Facebook Group proposed that "everyone should take a minute and report her Instagram acct. if enough people report it I would think it will get shut down," and posted the name of Plaintiffs' account, Mansor replied: "this is why I am doing this, to warn everyone."

137. When a member wrote that she hoped Gentile would be "blocked in all luxury groups all over facebook," Mansor replied: "she's definitely blocked in several."

138. On October 15, 2026, the Facebook Group's administrator published a rule to all of its members, titled "IMPORTANT GROUP RULE UPDATE," stating that "[d]ue to an increasing number of authenticity concerns brought to the Admin/Moderator

team's attention," and "[e]ffective immediately, VCA pieces acquired from sellers or sources that have been flagged for significant authenticity concerns may not be listed or resold within this group," and that the "restriction applies regardless of whether the current owner purchased the item in good faith, possesses a third-party authentication certificate, or personally believes the item to be authentic."

139. The rule states that the restrictions "do not constitute an accusation, finding of wrongdoing, or determination that any particular individual has knowingly sold counterfeit merchandise."

140. The rule followed seven weeks of Mansor's posts in the Facebook Group accusing Gentile by name. Its effect is that pieces purchased from FashionLux may no longer be resold in the Facebook Group, whatever their authenticity. A FashionLux customer who owns a Van Cleef & Arpels piece is now shut out of the market in which she would otherwise resell it, and FashionLux is shut out of a market in which both parties sell.

141. FashionLux customers have since contacted Gentile to say that they can no longer resell the pieces they bought from FashionLux and to demand refunds for them. Those customers had no complaint about their pieces before Mansor's posts. Their demands are for the price of pieces that are now unsaleable in the Facebook Group, not for pieces shown to be anything other than what FashionLux sold them.

142. When a commenter suggested taking the story to Gentile's local news station, Mansor replied: "yes definitely agree with you!!! Thank you."

143. When a commenter tagged @fashion_lux_finds_2 and asked whether Gentile was "willing to tank your business or be prosecuted or sued," Mansor replied: "thank you so much."

144. One commenter wrote: "I live right by her. I'll show up." A second commenter replied, tagging @chanelista123_: "I live in Fresno. I'll still show up with you. We stand with you and will back you." Mansor replied: "Ty girl," with a heart symbol.

145. When a reader wrote, "So glad I came across your post. Unfollowing her now," Mansor replied with three red hearts.

146. Mansor's audience acted on her posts. A person who had read them sent Gentile an Instagram message stating, "I'm going to report you to every single consigner and person that I know," and, "I'm gonna try to find everybody who's done business with you and I'm gonna expose you for being a fraud."

147. Others posted comments on Plaintiffs' Instagram account, including, "so you're the lady who sells fake VCA bracelets for the same price as authentic pieces?" and, "Probably fake."

148. Mansor has gathered a group of buyers whom she encourages to come forward against Gentile. She has told the Facebook Group that "we are quiet a few girls," as alleged in paragraph 89.

149. On information and belief, that group includes Vanlerberg and Borhan-Manesh, whom Mansor encouraged to come forward against Gentile.

150. Vanlerberg published the post alleged in paragraph 87, announcing to the Facebook Group that the "FBI IS NOW INVOLVED." Mansor confirmed that the post described her own case.

151. Between August 30 and October 7, 2026, after Mansor began her campaign, Borhan-Manesh sent Gentile text messages threatening and insulting her minor children. Among other things, she told Gentile to focus on her children, whom she called obese.

152. Over a piece of jewelry, the campaign Mansor started has descended to attacks on minor children. It is a true smear campaign, built on nothing but lies published online and designed to deter buyers from shopping with Plaintiffs and to direct them to Mansor.

153. Persons who joined Mansor's campaign have sent Gentile messages late at night about her minor children.

154. Plaintiffs received no such messages before Mansor began posting.

155. Mansor continues to recruit. On October 13, 2026, she published on @chanelista123_ her private messages to another buyer, in which she asked, "Can I share your experience?" The same day, she republished a May 2024 post by another person about an unnamed Instagram seller, captioned "Her post in 2024" and "This poor lady had warned everyone back in 2024 :(," and published screenshots of app results for other Van Cleef & Arpels pieces, captioned "Another lady!," presenting each as further evidence against Plaintiffs.

156. Every act Mansor directs at Plaintiffs serves her business. Each report against Gentile's account, each group that blocks Gentile, each reader who unfollows her, and each customer who stops buying from FashionLux is taken from a direct competitor in the market in which Mansor sells.

157. Mansor directs her audience against Plaintiffs to remove a competitor from that market and to take its customers for herself. It is a tactical advantage she has not earned by competing, and it is unfair.

**K. Defendant's Further Acts of Deception: Directing Authenticity Reports to Her Friend and Associate to Falsely Substantiate Her Smear Campaign**

158. Mansor has urged her audience to "use a third party company to authenticate all your VCa pieces! No matter who you got them from!!!"

159. Mansor has directed FashionLux customers to Kaleigh Kirby ("Kirby"), who issues letters under the name "Reality Check Authentication."

160. When a member of the Facebook Group asked Mansor where a buyer's pieces had been authenticated, Mansor answered: "this was legit grails," and "but we have used several like Kaleigh Kirby." On information and belief, Legit Grails is an online authentication service with no affiliation with Van Cleef & Arpels.

161. Kirby is not a disinterested third party. On information and belief, Kirby is Mansor's friend and associate in the resale trade and has no affiliation with Van Cleef & Arpels.

162. On information and belief, Mansor does not disclose that relationship to

the buyers she sends to Kirby.

163. Since Mansor began posting, FashionLux customers have presented Plaintiffs with Reality Check Authentication letters and demanded refunds.

164. By steering buyers to her own friend and associate for "authentication," and telling them to re-authenticate every piece "No matter who you got them from," Mansor reinforces her message to the market: do not trust Gentile; trust Mansor and the authenticator she chooses.

**L. Mansor Interferes with Plaintiffs' Contracts**

165. On January 13, 2026, Plaintiffs entered into an Enrollment Confirmation and Broadcast License Agreement with Inside Success TV LLC ("Inside Success") (the "Inside Success Agreement"). Under it, Inside Success agreed to produce and publish a "Women in Power" episode and feature about Gentile and FashionLux, to promote the feature on its platforms, and to maintain the placement for at least two years. Plaintiffs paid Inside Success $30,000.

166. In September 2026, Inside Success published a post on its Instagram account featuring Gentile and FashionLux (the "Feature Post"). Within days, it removed the Feature Post.

167. On September 15, 2026, Gentile wrote to Inside Success asking why the Feature Post had been removed and whether it would be restored.

168. On September 16, 2026, Inside Success responded in writing that, after the Feature Post was published, it had "received a number of comments and direct messages raising allegations concerning you and your business," and that, "[g]iven the nature of those allegations, we made the decision to temporarily remove the post while we gather additional information."

169. Inside Success identified the allegations: "the messages we received alleged that you and/or your business are currently the subject of an investigation related to the authenticity of items sold through your business."

170. Inside Success stated that it was "treating these as allegations" and was

"not making any determination as to their validity." It removed the Feature Post anyway.

171. Inside Success asked Gentile to address "whether there is an active investigation or formal legal action related to these allegations." No legal action was pending against Plaintiffs in any court.

172. On information and belief, persons in Mansor's audience, acting at her urging, sent those comments and direct messages.

173. The messages repeated the accusation Mansor had been publishing in the Facebook Group since August 27, 2026. Their claim that Plaintiffs were under investigation is the FBI claim Mansor has made to her audience, as alleged in paragraphs 85 through 93.

174. On information and belief, Mansor knew of the Feature Post and of Plaintiffs' business relationship with Inside Success. The Feature Post was published on Inside Success's public Instagram account and promoted on @fashion_lux_finds_2.

175. On September 17, 2026, Plaintiffs, through counsel, served Inside Success with a written notice of dispute under the Inside Success Agreement.

176. On September 25, 2026, Inside Success responded in writing that it "will arrange for the Women in Power feature/post to be restored."

177. Inside Success has never restored the Feature Post.

178. Plaintiffs paid $30,000 for a feature that Inside Success removed within days of publishing it and has never restored. Plaintiffs have lost the benefit of the Feature Post and of its promotion to Inside Success's audience.

179. Plaintiffs incurred attorneys' fees, and Gentile lost time from her business, in asserting Plaintiffs' rights under the Inside Success Agreement. Plaintiffs would not have incurred those fees or lost that time but for Mansor's conduct.

180. Mansor knew that FashionLux sells on consignment and depends on its consignors. Mansor sells through the same consignment model herself, as alleged in paragraphs 33 through 35, and knew that the pieces FashionLux offers for sale are held under consignment agreements with their owners.

181. FashionLux's consignment agreements are not terminable at will. Each requires the consignor to leave the consigned pieces with FashionLux for 120 days.

182. After Mansor's posts, consignors who had placed pieces with FashionLux under consignment agreements demanded the return of their pieces because of Mansor's accusations and terminated their consignments. In each instance alleged below, the consignor demanded the return of her pieces before the 120-day consignment period had expired, and FashionLux returned them on the consignor's demand.

183. On or about October 13, 2026, in the midst of Mansor's campaign and after discussing it with Gentile, a long-standing FashionLux consignor asked Gentile to return the pieces she had consigned, including a Chanel bow bag, loose stones, and a bracelet. She is also a long-standing FashionLux customer, and her husband has bought from FashionLux as well.

184. The consignor told Gentile that she had received "a good offer from Madison Ave Couture" and was "waiting to see what FP offers," referring to Fashionphile. Both are FashionLux's competitors.

185. Had those pieces sold, FashionLux would have earned approximately $2,988 on them.

186. Between August 27 and October 13, 2026, a second long-standing consignor wrote to Gentile that she was "sorry you're going through all of this" and hoped "things get resolved fairly and peacefully."

187. She then wrote: "Hey Amber! I've decided I'd like to have my items back for now. Could you please send me back my bag and both pairs of shoes? I'll send you prepaid shipping labels for everything." Her two pairs of shoes alone were expected to sell for approximately $1,550.

188. FashionLux has lost those pieces and the commissions it would have earned on them.

**M. Mansor Has Not Filed a Lawsuit**

189. Mansor has been represented by counsel since June 2026. She has not filed a lawsuit against Gentile or FashionLux in any court. Members of her audience nonetheless write in the Facebook Group that "there is a lawsuit," as alleged in paragraph 92.

190. Mansor has had the Bracelet since September 14, 2026, as alleged in paragraph 64.

191. When Mansor began posting on August 27, 2026, she had no determination from Van Cleef & Arpels and no judgment from any court that the Bracelet was counterfeit. Rather than prove her accusation, Mansor took it to a forum with no rules of evidence, no burden of proof, and no judge or jury bound by either, and one in which Gentile cannot answer.

192. Mansor's posts are not communications to any court, party, or counsel. They are addressed to the public.

193. Mansor's objective is not to recover $19,200. Her posts are addressed to "everyone who has been contacting me and following this" and invite her audience to share them. Mansor is using her accusations to build her own following and standing as a reseller.

194. As Mansor wrote in an Instagram story on October 9, 2026: "Yup and this is exactly why I'm doing it!! We need justice!"

195. The campaign is building Mansor's following. On October 13, 2026, another reseller account republished Mansor's post with the instruction: "Please follow @chanelista123_ For the story on a fake VCA She is spreading awareness." Mansor republished it on her own account.

196. Mansor has announced that she will continue. As alleged in paragraph 94, she wrote on October 13, 2026: "I will be posting along!!"

**N. Mansor Uses Her Lies to Market Herself Against FashionLux**

197. On information and belief, Mansor is primarily engaged in the business of reselling luxury goods.

198. Mansor's statements are representations of fact about the business operations and goods of a direct competitor. Mansor made them to actual and prospective customers of both Mansor and FashionLux, in the channels in which both sell, and to persons likely to repeat them to those customers, including the followers who reshared her posts, as alleged in paragraph 78.

199. On information and belief, Mansor made the statements for the purpose of promoting and securing sales of her own goods, diverting customers and consignors from FashionLux, and promoting her own standing as a reseller.

200. Mansor published her stories about Plaintiffs on @chanelista123_, the account through which she advertises and sells her inventory, to the followers to whom she markets it.

201. The Facebook Group is a marketplace, as alleged in paragraph 40. Mansor has boasted of her standing as a seller in such groups, as alleged in paragraph 36.

202. Each follower Mansor gains through her accusations is a prospective customer for her inventory. Her accusations have been republished with the instruction "Please follow @chanelista123_," as alleged in paragraph 195.

203. Mansor's campaign directly solicits FashionLux's actual and prospective customers to her own account, @chanelista123_.

204. There, Mansor sells Van Cleef & Arpels jewelry, and she uses the campaign to market it.

205. On or about October 13, 2026, Mansor posted an Instagram story on @chanelista123_ showing a stack of sealed shipping boxes, captioned: "While I am working on all the potential victims, Authentications, here are some items that are off to their new homes."

206. The same day, she posted a story showing a Van Cleef & Arpels bracelet

in its box, marked "SOLD."

207. Mansor advertises her own sales in the same breath as her campaign against Plaintiffs.

208. The customers Mansor's accusations drive away from FashionLux are led to a seller offering the same goods: Mansor.

209. Mansor goes after FashionLux's customers one at a time. When a FashionLux customer defended Gentile in the Facebook Group, Mansor argued with her in front of the group, told her she was "one of the lucky ones," and set out to convince her, and every member reading, that Gentile sells fakes, as alleged in paragraphs 99 through 103.

210. Mansor then told the same customer: "but [the customer], I do recommend you buy a VCA piece from her and let us know your experience," followed by a praying-hands emoji.

211. Mansor dismissed that customer's experience as luck because it contradicts her narrative.

212. Mansor accepts, without question and without proof, every claim that an item bought from Gentile is fake, and she invites more: "PM me I can do my best to help you," as alleged in paragraph 104. When a buyer says that what she bought from Gentile is authentic, Mansor attacks her, and so does her audience. In the Facebook Group, a member who says she received a fake is believed at once; a member who says she did not is called a scammer, accused of being Gentile, and told she will be blocked, as alleged in paragraphs 215 and 216.

213. She does so for one purpose: to keep her false narrative intact and to direct Gentile's customers to herself.

214. Mansor's audience follows her lead. When the same customer spoke up for Gentile, an anonymous account in the Facebook Group told her that "people like you are part of the problem," that "[j]ust because you had a 'good' experience doesn't mean the seller Amber is trustworthy," that "[g]oing to bat for a scammer isn't a good look," and

that she should "go through your collection and double check your items are indeed genuine."

215. On or about October 15, 2026, a second FashionLux customer wrote in the Facebook Group, under her own name, that it was "very sad to see all of these comments directed toward Amber," that she had "purchased a few items along the way" and "never had an issue," and that she had "been following Amber for a very long time and have genuinely grown to like and trust her." A moderator of the Facebook Group replied: "you must be kidding. There are so many victims of her."

216. On or about October 16, 2026, when another member wrote in the same thread that the customer "is entitled to her own experience without you trying to turn her to your side," members responded by asking "Amber is that you?," calling her "another scammer," and writing that "[t]he biggest fake in all of this is Amber herself." A moderator told the member: "yes you will be blocked. But, not now." Mansor answered the same member with the statement alleged in paragraph 105.

217. In the forum Mansor created, a buyer who speaks well of Gentile is attacked for it, and a member who objects to the attacks is told she will be blocked. Gentile cannot answer in that forum, as alleged in paragraph 67, and no one may answer for her.

218. That is the purpose of Mansor's lies. She makes herself the victim so that she can market herself as the trustworthy alternative: a seller whose items are "100% Authentic" and who is "working on . . . Authentications," as alleged in paragraphs 33 and 205.

219. The message to the market Mansor shares with FashionLux is plain: do not buy from Gentile; buy from Mansor.

220. What Mansor cannot match is what built FashionLux: Gentile's personality, and the buyers who choose Gentile over other sellers because of it, as alleged in paragraphs 22 and 23. Mansor's campaign is aimed at both.

**O. Mansor Acted with Knowledge of Falsity and with Malice**

221. Mansor knew the Mansor Statements were false, or published them with reckless disregard for their truth. By her own account, she wore the Bracelet for three years, had it serviced by Van Cleef & Arpels, and never doubted it, as alleged in paragraphs 50, 96, and 97. She lied about her own experience with Van Cleef & Arpels jewelry to cast herself as Gentile's victim, as alleged in paragraphs 109 through 115. She knew the FBI was not investigating Gentile. She knew that the records Plaintiffs provided were genuine. She knew that Gentile had never agreed to appear at Van Cleef & Arpels, because she arranged the appointment herself, as alleged in paragraphs 252 through 256. And she has told her audience what drives her: "everyone is jealous of me, everyone hates me," as alleged in paragraph 105.

222. Mansor has admitted that she knows nothing about the goods that make up most of FashionLux's business, as alleged in paragraph 20. When a reader asked, "Are the handbags fake too," Mansor answered: "that I don't know tbh."

223. Mansor received a cease-and-desist letter from Plaintiffs' counsel on June 18, 2026, as alleged in paragraph 62, and began publishing about Plaintiffs on August 27, 2026. Plaintiffs' counsel then demanded in writing on September 1, September 10, and September 13, 2026 that she stop, and on September 13 notified her that her publications were false and defamatory, as alleged in paragraphs 71 through 73. She continued to publish after each notice.

224. Mansor acted with the intent to injure Plaintiffs, and with oppression, fraud, and malice within the meaning of California Civil Code section 3294.

**P. Plaintiffs' Damages**

225. Before August 27, 2026, FashionLux had an established base of repeat customers and a steady volume of sales.

226. From May 1 through August 26, 2026, FashionLux made 229 sales totaling $569,820, an average of approximately 14 sales and $33,800 in sales each week.

227. From August 27 through October 14, 2026, FashionLux made 44 sales

totaling $120,374, an average of approximately 6 sales and $17,200 in sales each week. FashionLux's weekly sales fell by approximately half.

228. The decline began immediately. In the seventeen days before Mansor's August 27, 2026 post, FashionLux made 19 sales totaling $51,890. In the seventeen days after it, FashionLux made 8 sales totaling $23,874.

229. FashionLux does not keep the sale price. As alleged in paragraph 21, it keeps only its fee, generally ten to twenty percent of the sale price, and remits the rest to the consignor.

230. FashionLux's income therefore rises and falls with the volume of its sales. When its weekly sales fell by half, its fee income fell by approximately half. At fees of ten to twenty percent, FashionLux earned approximately $3,400 to $6,800 per week before August 27, 2026, and approximately $1,700 to $3,400 per week since. If its sales do not recover, FashionLux will lose approximately half of its annual fee income.

231. Because FashionLux keeps only a fraction of each sale, FashionLux depends on a steady volume of sales from repeat customers and on a steady supply of inventory from its consignors. Mansor's campaign has taken both.

232. FashionLux's customers stopped buying. Approximately 120 customers bought from FashionLux between May 1 and August 26, 2026. Fewer than 20 of them have bought from FashionLux since.

233. More than 40 of those customers bought from FashionLux more than once during that period. At least 28 of those repeat customers have made no purchase since Mansor began posting. Before August 27, 2026, they had spent more than $280,000 with FashionLux.

234. Customers forwarded Mansor's posts to Gentile. One wrote: "The news is everywhere."

235. Customers who had been satisfied with their purchases for months or years demanded refunds after reading Mansor's posts, and more have demanded refunds since the Facebook Group barred the resale of their pieces, as alleged in paragraph 141.

236. A customer initiated a credit card dispute and reversed the $4,750 charge on a completed purchase because of Mansor's accusations.

237. Consignors withdrew their pieces, taking FashionLux's inventory and future commissions with them.

238. Plaintiffs lost the benefit of the Inside Success Feature Post and its promotion, and incurred attorneys' fees and lost time in asserting their rights under the Inside Success Agreement, as alleged in paragraphs 165 through 179.

239. Gentile has suffered severe emotional distress.

240. Strangers message her late at night. People whom Mansor thanked have said they will "show up," one of them adding that she lives "right by her," as alleged in paragraph 144. Persons Mansor encouraged to come forward have threatened and insulted her children, as alleged in paragraphs 148 through 153.

241. Gentile is afraid to leave her home. She can no longer take her children to school.

242. She cannot keep her phone near her children, because of the messages she receives about them.

243. Gentile has sought medical treatment as a result of Mansor's conduct. On August 31, 2026, four days after Mansor's August 27 post, she began taking Xanax, prescribed for anxiety. She is in therapy.

**Q. Mansor Will Not Take the Bracelet to Van Cleef & Arpels**

244. On information and belief, Van Cleef & Arpels offers a full service, at a cost of approximately $1,800, through which it issues a certificate of authenticity. Van Cleef & Arpels has issued no certificate concerning the Bracelet, and no court has determined that the Bracelet is not authentic.

245. In the comments beneath his September 30, 2026 Facebook post, Vondran reported: "VCA would not agree to assist."

246. The Vondran Article concedes that only Van Cleef & Arpels can answer the question Mansor claims to have answered. Vondran writes that Van Cleef & Arpels is

"uniquely positioned to resolve this issue definitevly [sic]," and that experienced jewelry appraisers have told him "only Van Cleef can make the determination."

247. It states that online authentication services "are not willing to come forward and authenticate their findings, privide [sic] business records declarations, or be willing to testify as an expert witness."

248. Mansor's accusation rests on exactly such reports: an online report from Fashionphile, a competing reseller, and a report from a local jewelry appraiser with no affiliation with Van Cleef & Arpels, as alleged in paragraphs 51 and 77.

249. Mansor has had the Bracelet since September 14, 2026. Her own messages, alleged in paragraph 253, show that she deals directly with a Van Cleef & Arpels sales associate. She has not taken the Bracelet to Van Cleef & Arpels for the full service alleged in paragraph 244, or for any other determination of its authenticity.

250. Mansor has not taken the Bracelet to Van Cleef & Arpels because a determination by the brand would end her campaign.

251. Members of these forums have questioned why Mansor has not taken the Bracelet to Van Cleef & Arpels. On October 14, 2026, a FashionLux customer wrote in the Facebook Group that she would "genuinely like to see definitive proof from VCA confirming that the item is counterfeit, regardless of what it cost to do so." Mansor's reply offered no such proof, as alleged in paragraphs 99 through 103.

252. Instead, on or about October 14, 2026, in the same comment thread, Mansor published a screenshot of her July 17, 2026 text messages with a Van Cleef & Arpels sales associate.

253. In them, the associate wrote that she could "reserve the appointment until 12:15." Mansor asked her to "please let me know if she shows up and if she doesn't also let me know," and wrote: "I will forward this to my attorney." The associate replied: "No unfortunately she didn't yet."

254. Gentile held the Bracelet at that time, as alleged in paragraphs 57 through 64. Mansor published the excerpt to state to her audience, by clear implication, that

Gentile had agreed to bring the Bracelet to Van Cleef & Arpels on July 17, 2026, and had failed to appear.

255. That statement is incomplete and false. Gentile was never aware of the appointment, and neither Gentile nor anyone on her behalf ever agreed to drop off the Bracelet at Van Cleef & Arpels on July 17, 2026, or on any other date. Gentile was not a party to Mansor's messages with the sales associate. The excerpt Mansor published is incomplete: it contains no communication with Gentile or her counsel, because there was none, and it omits that Mansor arranged the appointment by herself, without telling Gentile. Mansor published the incomplete excerpt as proof that Gentile had done something wrong, knowing that Gentile had never agreed to appear.

256. On information and belief, Mansor arranged the appointment on her own, without any agreement from Gentile, so that she could later tell her audience that Gentile had failed to appear. She then used it, as she has used every other part of her campaign, to cast herself as the victim and Gentile as a seller with something to hide.

257. Mansor's audience understood the exchange as she intended. On or about October 16, 2026, a member of the Facebook Group wrote that Mansor "scheduled a drop off of the bracelet by amber to the VCA near her and she failed to show u[p]. Why? Because we all know why!" Plaintiffs plead that comment not as a statement by Mansor but to show how her audience understood what she published.

258. Even the lawyer who solicits such claims warns buyers against what Mansor has done. In the Vondran Article, under the heading "DON'T START A SOCIAL-MEDIA WAR," Vondran advises buyers who believe they have been defrauded:

> "If you believe you have been defrauded, your first instinct may be to warn everyone online. Be careful. Public accusations can complicate litigation and potentially create collateral disputes such as defamation and libel. Don't go there. Preserving evidence, obtaining competent

> authentication, identifying the responsible parties, and developing a legal strategy is generally more useful than engaging in a public argument."

259. Mansor has ignored that advice from her own Facebook friend. Rather than file a lawsuit, she has prosecuted her accusation in a forum of her own choosing: a private Facebook group and her own Instagram account, a forum with no judge, no rules of evidence, and no burden of proof, and one in which Gentile cannot appear. As alleged in paragraph 67, Gentile is not a member of the Facebook Group and cannot see or answer what is said there.

260. If Mansor had a legitimate claim, she could have brought it in a court. Plaintiffs would welcome that forum: a judge and a jury, the rules of evidence, and a burden of proof. Mansor has chosen social media instead, for one purpose and one purpose only: to make herself the trustworthy alternative to FashionLux, as alleged in paragraph 218.

261. Over a single bracelet, Mansor has accused Gentile by name of fraud and crime, recruited strangers to report, boycott, and confront her, and promised her audience more.

262. Mansor's conduct is outrageous. It exceeds all bounds of decency tolerated in a civilized community and bears no proportion to a dispute over a piece of jewelry.

**R. Mansor's Conduct Goes Far Beyond the Bracelet**

263. Mansor has used her complaint about a single bracelet as the occasion to defame Plaintiffs, disparage FashionLux's goods, interfere with Plaintiffs' contracts and business relationships, and inflict severe emotional distress on Gentile, all to market herself at FashionLux's expense.

264. That conduct is separate from the Bracelet Dispute and actionable whatever the Bracelet is. No authentication result could make the FBI investigate Gentile, turn FashionLux's genuine records into fabrications, give Gentile knowledge that Mansor admits she never had herself, turn an appointment Gentile never agreed to into one she

failed to keep, or make true Mansor's lies about her own experience.

265. No outcome of the Bracelet Dispute, whether a refund, a determination by Van Cleef & Arpels, or a judgment for either side, would undo the resulting harm. Had Plaintiffs paid Mansor in full, every statement would remain published, every customer and consignor who left would remain gone, the reversed charge would remain reversed, and Gentile would remain in treatment.

266. Plaintiffs' damages, alleged in paragraphs 225 through 243, flow from Mansor's statements and conduct, not from the Bracelet. They exceed the Bracelet's price many times over.

267. Mansor will not stop on her own. She has ignored three written demands, removed nothing, and announced that she "will be posting along," as alleged in paragraphs 62, 71 through 73, and 94.

268. Plaintiffs reported Mansor's posts to Meta. The posts remain published.

269. Only a court can stop her. Plaintiffs ask this Court to adjudicate the falsity of Mansor's statements, to compensate Plaintiffs for the harm those statements have caused, and, following that adjudication, to enjoin their continued publication.

270. Mansor's campaign has no legitimate purpose. It exists to gain Instagram followers through false, unproven, and unsubstantiated statements about Plaintiffs.

271. Mansor's only purposes are to injure Plaintiffs out of malice, to promote her own business, to gain followers and attention on social media, and to divert FashionLux's customers to herself for her own enrichment.

## FIRST CAUSE OF ACTION

## (Defamation (Libel Per Se), Cal. Civ. Code §§ 44, 45, 45a)

## (By All Plaintiffs Against Defendant)

272. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

273. Mansor published the Mansor Statements in writing, on the internet, to third parties, including the members of the Facebook Group and the followers of @chanelista123_.

274. Each statement is of and concerning Plaintiffs. Each identifies Gentile by name, refers to her business, or tags @fashion_lux_finds_2.

275. Each statement asserts or implies provably false facts: that Plaintiffs knowingly sell counterfeit goods, have defrauded customers, fabricated business records, agreed to present the Bracelet to Van Cleef & Arpels and failed to appear, and are under investigation by the FBI.

276. Mansor's statement that the FBI is investigating Gentile, alleged in paragraphs 85 through 93, is by itself libel per se. It is false. It charges Gentile with conduct warranting a federal criminal investigation. Mansor published it, and encouraged others to publish it, to Plaintiffs' customers.

277. Each statement is false.

278. Each statement is defamatory on its face. Each charges Plaintiffs with criminal conduct and tends directly to injure them in their trade by imputing dishonesty in the sale of the goods they sell. To the extent any statement requires context to convey its defamatory meaning, that meaning was evident to its readers, who were buyers and sellers of Van Cleef & Arpels jewelry reading posts about Gentile's sales.

279. The statements were not privileged. Mansor published them to the approximately 50,300 followers of @chanelista123_, to the approximately 23,900 members of the Facebook Group, and to reseller accounts that republished them with the instruction to follow @chanelista123_, an audience far larger than any group of persons sharing a common interest in the Bracelet Dispute. Mansor published them with the knowledge of falsity, reckless disregard for the truth, and ill will alleged in paragraphs 221 through 224, and continued to publish them after written notice that they were false.

280. Mansor published the statements with knowledge of their falsity or with reckless disregard for their truth, and with hatred and ill will toward Plaintiffs.

281. As a direct and proximate result, Plaintiffs have suffered injury to their reputations and business, and Gentile has suffered shame, mortification, and emotional distress. Because the statements are libelous per se, damages are presumed. Plaintiffs

have also suffered actual damages in an amount to be proven at trial.

282. Plaintiffs have also suffered special damages as a proximate result of the statements, as alleged in paragraphs 227 through 238 and 182 through 188, and as alleged in the Second Cause of Action. Those special damages support this claim as to any statement found to require extrinsic facts to convey its defamatory meaning.

283. Mansor acted with oppression, fraud, and malice. Plaintiffs are entitled to punitive damages under California Civil Code section 3294.

**SECOND CAUSE OF ACTION**

**(Trade Libel)**

**(By Plaintiff FashionLux Against Defendant)**

284. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

285. Mansor published statements disparaging the authenticity and quality of the goods FashionLux sells, including the Mansor Statements.

286. The statements are false. Mansor knew they were false or acted with reckless disregard for their truth.

287. Mansor intended the statements to cause, and reasonably should have recognized that they would cause, actual and prospective customers and consignors to refrain from dealing with FashionLux.

288. Actual and prospective customers and consignors relied on the statements and ceased dealing with FashionLux. The statements caused FashionLux special damages, as alleged in paragraphs 227 through 238 and 182 through 188, including:

(a) a customer's reversal of a $4,750 charge on a completed purchase because of Mansor's accusations;

(b) the loss of a long-standing consignor's pieces, including a Chanel bow bag, loose stones, and a bracelet, on which FashionLux would have earned approximately $2,988;

(c) the loss of a second long-standing consignor's bag and two pairs of shoes, the shoes alone expected to sell for approximately $1,550,

and the fees FashionLux would have earned on them;

(d) the refund demands of customers who, following the Facebook Group's October 15, 2026 rule, can no longer resell the pieces they bought from FashionLux, as alleged in paragraph 141; and

(e) the fees lost on the sales FashionLux did not make after August 27, 2026, from repeat customers who stopped buying from it, in an amount to be proven at trial.

289. Mansor acted with oppression, fraud, and malice. FashionLux is entitled to punitive damages under California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations)**

**(By All Plaintiffs Against Defendant)**

290. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

291. Valid contracts existed between Plaintiffs and Inside Success, in the form of the Inside Success Agreement, and between FashionLux and its consignors, in the form of FashionLux's consignment agreements. Neither is terminable at will. The Inside Success Agreement required Inside Success to maintain the placement for at least two years, and each consignment agreement requires the consignor to leave the consigned pieces with FashionLux for 120 days, as alleged in paragraphs 165 and 181.

292. Mansor knew of those contracts.

293. Mansor engaged in intentional acts designed to induce a breach or disruption of those contracts, or knew that a breach or disruption was substantially certain to result from her conduct, including by publishing and causing others to publish to Inside Success and to FashionLux's consignors the false accusation that Plaintiffs sell counterfeit goods and are under investigation by the FBI.

294. Mansor accomplished that interference through independently wrongful means, including defamation and trade libel.

295. Those contracts were actually disrupted. Inside Success removed the

Feature Post and has never restored it, as alleged in paragraphs 165 through 179. FashionLux's consignors terminated their consignments before the 120-day consignment period had expired, as alleged in paragraphs 182 through 188.

296. As a direct and proximate result, Plaintiffs have been damaged in an amount to be proven at trial, including the loss of the Inside Success Feature Post and its promotion, the attorneys' fees and time expended in asserting Plaintiffs' rights under the Inside Success Agreement, and the loss of consigned inventory and the commissions it would have generated.

297. Mansor acted with oppression, fraud, and malice. Plaintiffs are entitled to punitive damages under California Civil Code section 3294.

**FOURTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

**(By All Plaintiffs Against Defendant)**

298. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

299. Plaintiffs had economic relationships with their existing and prospective customers and consignors, including FashionLux's repeat customers, that carried the probability of future economic benefit to Plaintiffs.

300. Those relationships included FashionLux's repeat customers who have made no purchase since Mansor began posting, as alleged in paragraph 233, and the consignors who withdrew their pieces, as alleged in paragraphs 182 through 188. Each of those customers and consignors is identified by name in FashionLux's records.

301. Mansor knew of those relationships. Her stated purpose was to end them.

302. When a FashionLux customer defended Gentile, Mansor argued with her publicly to turn her against Gentile, as alleged in paragraph 209.

303. Mansor engaged in conduct that was wrongful independent of the interference itself, including defamation and trade libel, for the purpose of disrupting those relationships.

304. Those relationships were actually disrupted. Repeat customers stopped

buying, customers demanded refunds, a customer reversed a $4,750 charge, prospective customers ceased dealing with FashionLux, and consignors withdrew their pieces.

305. As a direct and proximate result, Plaintiffs have been damaged in an amount to be proven at trial.

306. Mansor acted with oppression, fraud, and malice. Plaintiffs are entitled to punitive damages under California Civil Code section 3294.

**FIFTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

**(By Plaintiff Gentile Against Defendant)**

307. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

308. Mansor's conduct toward Gentile was extreme and outrageous. Mansor warned Gentile that her reputation would suffer, then set out to destroy it before an audience of tens of thousands, falsely told that audience that the FBI was investigating Gentile, encouraged strangers to act against her, including persons who then threatened and insulted her children, and publicly thanked a commenter who said she lives "right by" Gentile and would "show up."

309. Mansor intended to cause Gentile emotional distress, or acted with reckless disregard of the probability that her conduct would do so. Mansor continued after receiving the written notices alleged in paragraphs 71 through 73.

310. Gentile has suffered severe emotional distress, as alleged in paragraphs 239 through 243.

311. Mansor's conduct was a substantial factor in causing Gentile's severe emotional distress.

312. Mansor acted with oppression, fraud, and malice. Gentile is entitled to punitive damages under California Civil Code section 3294.

**SIXTH CAUSE OF ACTION**

**(Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.)**

**(By Plaintiff FashionLux Against Defendant)**

313. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

314. Mansor has been engaged in business as a reseller of Van Cleef & Arpels jewelry and other luxury goods, in competition with FashionLux, since at least October 2021, as alleged in paragraph 34.

315. Mansor's conduct alleged in this Complaint constitutes unfair and fraudulent business acts and practices. Mansor has made false statements of fact about a competitor's goods to that competitor's customers, falsely represented to those customers that the FBI is investigating the competitor, and solicited those customers to report the competitor's accounts and cease dealing with it. Those statements are likely to deceive members of the public. The conduct significantly threatens and harms competition: it seeks to exclude a competitor from the market by means other than competition on the merits.

316. Mansor uses her campaign to gain an unfair competitive advantage over FashionLux. She falsely presents herself as a naive first-time buyer deceived by a competitor, holds herself out as the trustworthy, authenticating alternative, and tells that competitor's customers and consignors, in substance, to stop buying from FashionLux and buy from her, as alleged in paragraphs 109 through 115 and 204 through 220. Her false account of her own experience is likely to deceive the public, and it is designed to.

317. FashionLux has suffered injury in fact and has lost money and property as a result of Mansor's conduct, including lost fees, a reversed $4,750 charge, and the loss of consigned inventory and the commissions it would have generated.

318. Mansor has continued her conduct after three written demands, has announced that she "will be posting along," and will continue unless enjoined. FashionLux is entitled to injunctive relief under California Business and Professions Code section 17203.

319. FashionLux has no adequate remedy at law for Mansor's continuing conduct. Damages cannot stop future publications, and they cannot restore the customers and consignors that each new publication drives away.

**SEVENTH CAUSE OF ACTION**

**(False Advertising, Lanham Act, 15 U.S.C. § 1125(a)(1)(B))**

**(By Plaintiff FashionLux Against Defendant)**

320. Plaintiffs reallege and incorporate by reference paragraphs 1 through 271.

321. FashionLux's goods travel in interstate commerce. FashionLux, an Illinois company, sells to buyers throughout the United States through Instagram and ships the pieces it sells across state lines. Mansor's statements were published from California to buyers throughout the United States, including in Illinois.

322. Mansor is in commercial competition with FashionLux, as alleged in paragraphs 32 through 37 and 197 through 208.

323. The Mansor Statements are commercial speech. Mansor made them in the channels through which she advertises and sells her own inventory, to the audience to which she markets that inventory, with an economic motive, and for the purpose of influencing buyers to purchase Van Cleef & Arpels jewelry and other luxury goods from her rather than from FashionLux, as alleged in paragraphs 197 through 220.

324. The Mansor Statements are false statements of fact about the nature, characteristics, and qualities of FashionLux's goods and commercial activities: that the goods FashionLux sells are counterfeit, that FashionLux knowingly sells counterfeit goods, that it has defrauded its customers, that it fabricated its business records, that its principal agreed to present a piece to Van Cleef & Arpels and failed to appear, and that it is under investigation by the FBI.

325. The Mansor Statements were disseminated sufficiently to the relevant purchasing public to constitute commercial advertising or promotion. Mansor published them to the approximately 23,900 members of the Facebook Group, a marketplace for the very goods both parties sell, and to the approximately 50,300 followers of

@chanelista123_, and they were republished to further buyers by Mansor's followers and by other reseller accounts, as alleged in paragraphs 78 and 195.

326. The Mansor Statements are literally false. In the alternative, they are misleading, and they have actually deceived a substantial segment of their audience. Customers who had been satisfied with their purchases demanded refunds, a customer reversed a $4,750 charge, consignors withdrew their pieces, readers announced that they were unfollowing FashionLux, and Inside Success removed the Feature Post, each after reading or receiving the accusations Mansor published, as alleged in paragraphs 165 through 188 and 225 through 238.

327. The deception is material. In the market for pre-owned luxury goods, authenticity is the consideration on which a buyer decides whether to purchase, and a seller's reputation for authenticity is its business, as alleged in paragraph 30. A statement that a seller's goods are counterfeit, or that the seller is under federal investigation for selling counterfeits, is likely to influence a buyer's decision to purchase from that seller.

328. FashionLux has been injured by the direct diversion of sales from FashionLux to Mansor and by the lessening of the goodwill its goods enjoy among the buyers and consignors in the market the parties share, as alleged in paragraphs 225 through 238. Those injuries to FashionLux's commercial interest in its sales and reputation were proximately caused by the Mansor Statements.

329. Mansor's conduct was willful and deliberate. She published the Mansor Statements after written notice that they were false, and she has announced that she will continue, as alleged in paragraphs 223 and 267. This is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

330. FashionLux is entitled under 15 U.S.C. § 1117(a) to recover Mansor's profits, FashionLux's damages, and the costs of this action, to an enhancement of its damages of up to three times the amount found, and to its reasonable attorneys' fees, and under 15 U.S.C. § 1116(a) to injunctive relief restraining Mansor's further false advertising.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. For general damages, including presumed damages, according to proof, in an amount not less than $500,000;
2. For special damages according to proof;
3. For punitive and exemplary damages under California Civil Code section 3294 on the First through Fifth Causes of Action;
4. For Defendant's profits, FashionLux's damages, enhanced damages of up to three times the amount found, costs, and reasonable attorneys' fees under 15 U.S.C. § 1117(a) on the Seventh Cause of Action;
5. For a permanent injunction, under 15 U.S.C. § 1116(a), California Business and Professions Code section 17203, and following a final determination that the statements alleged in this Complaint are false and defamatory, (a) requiring Defendant to remove each statement so determined from every platform and account under her control, and (b) enjoining Defendant from republishing any statement so determined;
6. For prejudgment and post-judgment interest at the maximum legal rate;
7. For costs of suit; and
8. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable. Fed. R. Civ. P. 38(b); L.R. 38-1.

Dated: October 16, 2026

By: ______________________________
William A. Aniello, Esq. (SBN 345080)
23320 Oxnard Street
Woodland Hills, California 91367
(917) 757-2244
willaniello@esjlaw.info

JOHANNESEN & UMANA, P.C.
Elizabeth Sarah Johannesen, Esq.
*Founding Partner*
(pro hac vice application forthcoming)
68 Jay Street, Suite 225
Brooklyn, New York 11201
(917) 757-2244
elizabethsarahjohannesen@esjlaw.info

*Attorneys for Plaintiffs*

**VERIFICATION**

STATE OF ILLINOIS )

) ss.:

COUNTY OF KANE )

I, Amber Gentile, am a Plaintiff in this action and the sole member of Plaintiff FashionLuxDesigner LLC. I have read the foregoing Complaint and know its contents. The matters stated in it are true of my own knowledge, except as to matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October ___, 2026, at Elgin, Illinois.



______________________________

Amber Gentile, individually and as sole member of FashionLuxDesigner LLC